Estate of George P. Rhodes, Deceased, John B. Rhodes and George P. Rhodes, Jr., Executors v. Commissioner.
Estate of George P. Rhodes v. Commissioner
Docket No. 6362.
United States Tax Court
1947 Tax Ct. Memo LEXIS 294; 6 T.C.M. (CCH) 174; T.C.M. (RIA) 47037; February 24, 1947
George B. Berger, Esq., 1220 Berger Bldg., Pittsburgh, Pa., Kingman Brewster, Esq., and O. R. Folsom-Jones, Esq., for the petitioners. R. Bruce Jones, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined a deficiency in estate tax in the amount of $121,444.05. The parties have entered into stipulations which dispose of certain allegations *295 of error which are set forth in the petition; petitioner has conceded the correctness of certain determinations; and respondent has agreed that the estate is entitled to certain deductions. Effect will be given to all of these agreements of the parties under Rule 50 when they shall submit recomputations of the estate tax liability. There are two issues to be decided: (1) Whether the corpus of a trust created in 1916 by the decedent is includible in the gross estate under the provisions of sections 811 (c) or 811 (d) (2) as amended; and (2) whether the proceeds of ten insurance policies on the life of the decedent are includible in the gross estate under sections 811 (g), 811 (c), or 811 (d) of the Internal Revenue Code. The estate tax return was filed with the collector for the twenty-third district of Pennsylvania. Issue 1 - The Trust Created on February 5, 1916 Findings of Fact The decedent was born March 21, 1871. He died December 12, 1940, domiciled in Pittsburgh. He was survived by Ellen B. Rhodes, his widow, John B. Rhodes, son, Roberta P. Rhodes Quaile, daughter, George P. Rhodes, Jr., son, and three grandchildren. Ellen B. Rhodes died on September 25, 1941. All *296 of the children and grandchildren of the decedent are living. The dates of birth of the children and grandchildren of the decedent are as follows: Name
Relationship
Birth date Age on 12/12/40
John B. Rhodes
Son
Sept. 6, 1899 41 years
John Rhodes, Jr.
Grandson
1925 15 years
Mary Ellen Rhodes
Granddaughter
1932 8 years
Roberta Rhodes Quaile
Daughter
Feb. 15, 1903 37 years
George Quaile
Grandson
1928 12 years
George P. Rhodes, Jr.
Son
May 1, 1907 33 years
On February 16, 1916, the decedent executed a trust agreement with Colonial Trust Company, trustee. Colonial is still the trustee. Under the instrument, the decedent created a trust for the benefit of his three children, John, George, and Roberta. The decedent transferred $10,000 to the trustee upon creation of the trust. He reserved the right to add to the trust corpus. The trust agreement provided that trust income should be added to principal during the donor's lifetime; that the principal should be invested and reinvested by the trustee; and that "At the death of the Donor," the trustee shall divide the principal and accruals of income into * * * the same number of equal parts as the number *297 of said children living and of said children who have prior to that time died leaving issue then surviving the issue of any such deceased child to count as one person for the purpose of such division and to receive, free from all trusts, the share of the trust estate which would have been held in trust for such deceased child if then surviving. The trust agreement further provided that upon the division of the estate into equal parts at the death of the donor, each part should be retained in trust for each beneficiary, John, George, and Roberta for life, and that each should receive the net income of his or her share during life after the beneficiary becomes 25 years of age; and that upon the death of each of the above named beneficiary, the trust for him or her shall end, and the principal and accrued income shall vest in his or her issue living at his or her death. The Third clause of the trust, relating to the donor's son John B. Rhodes provided further as follows: THIRD: * * *; but if, after the death of the Donor, John Bower Rhodes shall die and shall not leave issue then surviving, then the principal and accrued income held in trust for him shall at his death be added to *298 the trust estate or estates held hereunder for the other or others of said children of the Donor who may be living at the said death of John Bower Rhodes, and if one or both of the others of said children of the Donor be not living at the said death of John Bower Rhodes, then the share which would otherwise be held in trust for that one or both of said children, as the case may be, shall, on the said death of John Bower Rhodes, vest absolutely, free and discharged of all trusts, in the then surviving issue of such child or of both such children, per stirpes and not per capita. The Fourth and Fifth clauses of the trust, relating to Roberta Rhodes and George Rhodes, Jr., contain the identical terms as the Third clause, except for the differences in the names of the children of the donor. The other material clauses of the trust agreement are as follows: SIXTH: If all of said children shall die in the lifetime of the Donor and none of them shall leave issue living at his or her death, than [then] and in such case the trust shall, at the death of the last survivor of them, immediately cease and determine, and the entire trust estate, principal and income, shall be assigned, transferred *299 and set over, free and clear of all trusts, to the Donor, forthwith, in cash or, in the discretion of the Trustee, in the condition of investment in which it may then be, provided that securities held in kind as aforesaid shall be transferred to the Donor in kind. SEVENTH: If all of said children shall die after the death of the Donor and not leave issue living at his or her death, then and in such case the trusts shall cease and determine and the entire estate, principal and interest, forthwith, in cash or, in the discretion of the Trustee, in the condition of investment in which it shall then be, shall vest in such person or persons to whom the said Donor may by last will and testament have bequeathed the same, and, in default of such bequest, then to the heirs at law of the said Donor then living, per stirpes and not per capita, provided that securities held in kind as aforesaid shall be transferred to the Donor in kind. * * *
NINTH: Neither the principal nor income of the trust estate shall at any time be liable for any of the debts, contracts, obligations or engagements of John Bower Rhodes, Roberta Peebles Rhodes or George Pearson Rhodes, or any of them, heretofore or *300 hereafter made, contracted or incurred, and may not be by them, or any of them, anticipated, sold, assigned, transferred or set over, and may not be seized or taken in execution for the payment of their, or any of their, present or future debts, contracts, obligations or engagements. * * *
TWELFTH: The Donor reserves, and shall have, the right at any time during his life to rescind, revoke and terminate this instrument and the trust hereby created by written notice thereof delivered to the Trustee, in which event the trust estate shall forthwith be transferred and delivered by the Donor free from all trusts, in cash or, in the discretion of the Trustee, in the condition of investment in which it may then be, and all rights of the beneficiaries or the Trustee hereunder shall terminate. At some time prior to the early part of 1931, the decedent wrote at the end of the original copy of the trust agreement in ink the notation: "I hereby revoke clause TWELFTH on page nine. - G.P.R." Opinion The respondent has included the value of the corpus of the 1916 Trust in the gross estate of the decedent under section 811 (c) and/or 811 (d) (2), as amended by the Internal Revenue Code. *301 No contention is made that the transfers to the trust were made in contemplation of death in regard to the physical and mental condition of the donor. Respondent bases his contentions upon the provisions of the trust agreement. He contends, first, that the trust is includible in the estate under section 811 (c) because it represented a transfer intended to take effect in possession or enjoyment at or after the donor's death. He takes the view that the donor specifically provided for a reversion of the corpus of the trust to himself upon the contingency of his outliving the named beneficiaries, dying without issue, and that the transfer to the trust could not and did not take effect in enjoyment and possession until at or after the death of the donor within the interpretation of section 811 (c) in Klein v. United States, 283 U.S. 231; Helvering v. Hallock, 309 U.S. 106; and Fidelity-Philadelphia Trust Co. v. Rothensies, 324 U.S. 108. He relies also upon Estate of Arthur Sinclair, Deceased, 6 T.C. 1080. Respondent's second contention is that the donor, under clause 12, reserved to himself the right to revoke the trust, so as to bring *302 it within section 811 (d). He argues that it is a settled rule of the law of trusts that if a settlor reserves the power to revoke a trust "as an entirety" he can not modify the trust, although he can revoke the trust and if he so desires create a new trust. Restatement of the Law of Trusts, par. 331 (g); Scott on Trusts, p. 1809, par. 330.11; Bogert on Trusts and Trustees, Vol. 4, par. 996; National Newark and Essex Banking Co. v. Rosahl, 128 Atl. 586, 587. He argues that the construction to be placed upon clause 12 must be that the donor, in effect, reserved the right to "revoke in its entirety" the trust. Petitioners contend that the decedent effectively "cancelled his right to revoke the 1916 trust;" and that the trust does not come within section 811 (c). Petitioners rely chiefly upon Frances Biddle Trust, 3 T.C. 832; and Estate of Fahnestock, 4 T.C. 1096. We think that the decedent retained at his death both an express possibility of reverter and also power of appointment over the corpus of the 1916 trust, either of which is sufficient to bring the corpus into the gross estate under section 811 (c) as construed by the Supreme Court in *303 Helvering v. Hallock, supra; and Fidelity-Philadelphia Trust Co. v. Rothensies, supra. See, also, Estate of Arthur Sinclair, supra. The trust agreement provided that the trust income was to be accumulated and added to principal during the lifetime of the decedent. Although the decedent did not retain a life estate in the income, no one else was given possession or enjoyment of any of the property until the decedent's death. The principal and income were made subject to spendthrift provisions, so that the beneficiaries could in no way anticipate their enjoyment of the trust property by voluntary alienation or otherwise. Until the death of the decedent, the beneficiaries received nothing. At the death of the decedent the income was to be paid to his three children only if they were living at that time. In the event the children did not survive the decedent or at their death any time thereafter, the trust corpus was to be paid free and clear of the trust to the then surviving issue of the children. By paragraph 7, however, the decedent provided that if all of his children should die after his death and not leave issue surviving, the trust was *304 to terminate and the trust estate was to be transferred free and clear of the trust to such persons whom the decedent might appoint by will. This power of appointment is substantially the same as the one involved in Fidelity-Philadelphia Trust Co. v. Rothensies, supra, which was held sufficient to cause the trust corpus to be included in the gross estate. In the Fidelity-Philadelphia case the income at the death of the settlor was to be paid to her two daughters for life and at their death the corpus was to be paid to their surviving descendants. But if the daughters died without leaving surviving descendants the corpus was to be paid to such persons as the settlor might appoint by will. Here, as in the Fidelity-Philadelphia case, the ultimate disposition of all the trust property was suspended during the life of the decedent. Only at or after his death was it certain whether the property would be distributed under the power of appointment or as provided in the trust instrument. The life estates of the children were contingent upon their surviving their father and took effect in enjoyment only at his death. The remainder interests of the issue of the children were *305 contingent upon their surviving both the decedent and their parents and took effect in possession only after the death of the decedent. Thus, until the moment of his death or until an undetermined time thereafter the decedent held a string or contingent power of appointment over the total corpus of the trust. The retention of such a string which might have resulted in altering completely the plan contemplated by the trust instrument for the transmission of the decedent's property, subjects the value of the entire corpus to estate tax. Fidelity-Philadelphia Trust Co. v. Rothensies, supra. Moreover, the decedent retained an express possibility of reverter in the trust corpus sufficient to cause the corpus to be included in the gross estate. Paragraph 6 of the trust agreement provided that if all of the children of the decedent should die in his lifetime leaving no issue surviving, the trust estate was to be transferred free and clear of the trust back to the decedent. At the time of the decedent's death in 1940 he was survived by his three children and three grandchildren. Hence, at that moment the trust had not yet shed the possibility that the grandchildren might *306 predecease their parents and the children predecease the decedent to cause the possibility of reverter to be operative and bring back the trust corpus to the decedent. See Goldstone v. United States, 325 U.S. 687. Since the decedent retained an express possibility of reverter and since the children and grandchildren received no interest in enjoyment or possession of any of the trust property until or unless they survived the decedent, the transfer was intended to take effect in possession or enjoyment at or after the decedent's death within the meaning of section 811 (c). Estate of Arthur Sinclair, supra. It is so held. If we substitute for the decedent's three children named as the income beneficiaries of the trust, the daughter named in the second trust involved in the Sinclair case, we have the exact possibility of reverter which was held to constitute a survivorship trust in that case. There the decedent provided that the income was to be paid to his daughter for life and that if the daughter predeceased the decedent leaving no issue her surviving, the trust was to terminate and the trust property transferred to the decedent outright. In the present *307 case, if the children predeceased the decedent leaving no issue surviving, the trust was to terminate and the property paid back to the decedent. Examining the instant trust in the frame-work of extrinsic circumstances, the substitution of the daughter in the Sinclair case for the three children in the present case makes no appreciable difference in the nature of the possibility of reverter. The three children were all minors at the time the trust was set up in 1916. There was therefore more than a remote possibility, as was also observed in the Sinclair case, that they would predecease their father without issue surviving and that the trust corpus would return to the decedent. Cf. Estate of Nettie Friedman, 8 T.C. 68 (promulgated January 17, 1947). If anything, the case presents a clearer instance of a taxable survivorship trust than the Sinclair case since the remainder interests in the corpus could only take effect after the decedent's death and be enjoyed by the grandchildren who were then alive, while in the Sinclair case the grandchildren only had to survive their parents, not the decedent, in order to vest the remainder in possession and enjoyment. Obviously, *308 the decedent's death cut off the possibility of reverter and freed the life estates of the children and the remainder interests of their surviving issue from the contingency that the entire corpus would revert to the decedent. Petitioners seek to distinguish the Fidelity-Philadelphia Trust Co. case on the ground that in that case the power of appointment became effective if the trust failed either during or after the lifetime of the decedent while here it is claimed the power of appointment became effective only if the trust failed after the decedent's death. We fail to see the significance of this distinction, assuming arguendo the factual differences asserted, since decedent's children and their issue had no rights of possession or enjoyment in the trust property until after the decedent's death. But petitioners are wrong in their facts. If the children and their issue died during decedent's lifetime it was expressly provided in the trust agreement that the corpus of the trust would be returned to the decedent. Obviously, this provision contemplated that the property would be returned to the decedent while he was alive and that he could thereafter dispose of the trust property *309 inter vivos as well as by will, which gave the decedent a tighter hold over the property than the return of the property to him only under a power of appointment by will. Petitioners also argue that the express possibility of reverter has no more significance than one by operation of law and that the case should be treated as if the express possibility of reverter did not exist. This argument has familiar ring, since it is usually made the other way around by the Commissioner in seeking to have a reverter by operation of law accorded the same tax treatment as one expressly provided for in the instrument. In Estate of Edward P. Hughes, 7 T.C. 1348, and Estate of Nettie Friedman, supra, we rejected this argument of the Commissioner where there existed only by operation of law an extremely remote possibility of reverter. But we have already observed that in the present case there existed much more than a remote possibility that the trust corpus would revert to the decedent. It would therefore be somewhat incongruous for us now to sustain petitioners' contention that the type of express possibility of reverter present here should be treated the same as a remote *310 one arising by implication of law and that the latter should be ineffective for purposes of including the trust corpus in the gross estate under section 811 (c). In any event, Frances Biddle Trust, supra, and Estate of Fahnestock, supra, on which petitioners rely, each involved an extremely remote possibility of reverter where the rights of the beneficiaries were in no way conditioned on survivorship of the settlor, and give no support to petitioners' contention as applied to the facts here involved. Petitioners finally argue that the value of the life estates in the children should be deducted from the value of the corpus to be included in the gross estate. But the life estates in the children did not arise until after the decedent's death and were subject to divestment by the possibility of reverter and contingent power of appointment. There is thus no basis for deducting their values as suggested by petitioners. Fidelity-Philadelphia Trust Co. v. Rothensies, supra. Although petitioners do not make any argument relating to the effect of the time of the creation of the trust in the year 1916 upon the inclusion of the trust in the gross *311 estate, any such question is disposed of in favor of the respondent on the authority of Estate of Harold I. Pratt, 5 T.C. 881; affirmed 156 Fed. (2d) 235; certiorari denied, 329 U.S. 765, (Oct. 28, 1946). The holding that the 1916 trust is includible in the gross estate under section 811 (c) as a transfer intended to take effect and enjoyment at or after the decedent's death makes it unnecessary to consider respondent's second contention that the trust estate is also properly included in the gross estate under section 811 (d) (2). Issue 2 - The TenInsurance Policies Findings of Fact On February 4, 1930, the decedent, as donor, and the Fidelity Trust Co., as trustee, executed two trust agreements, one for the benefit of decedent's wife, Ellen B. Rhodes, and the other for the benefit of decedent's daughter, Roberta Rhodes Quaile. Under these instruments, the decedent agreed to deliver and cause to be made payable to the trustee certain insurance policies on his life. The corpus of the trust for decedent's wife consisted of nine policies of insurance on the life of the decedent. The corpus of the trust for the daughter consisted of one insurance *312 policy on the life of decedent. Except for the name of the beneficiary and the number of insurance policies comprising the corpus of each trust, the two trusts were substantially identical. Only the provisions of the trust for decedent's wife will be set forth. The trust agreement provided that the income of the trust was to be paid to decedent's wife for life and at her death to decedent's children. Upon the death of the children, the trust corpus was to be paid to their respective issue. In the event all of decedent's children died leaving no surviving descendants, the trust corpus was to be transferred in accordance with the intestate laws of Pennsylvania to the next of kin of the decedent then living. The instrument further recited that the decedent agreed and directed that upon his death the proceeds of the insurance policies were to be paid to the trustee. Any income arising from monies, securities, or other property paid or transferred by the decedent or any other person was to be applied to the payment of premiums on the policies of insurance, or to such other purposes as the decedent might in writing direct. The trustee was under no obligation to pay any premiums on the *313 insurance policies unless the amount necessary to pay such premiums had been received by the trustee for that purpose. The beneficiaries' interests were made subject to spendthrift provisions. The beneficiaries could in no way anticipate their enjoyment of the trust principal or income by voluntary alienation or otherwise. It was also provided that the trustee might, at its discretion, purchase any property of which the decedent died seized or possessed, and might make loans, secured or unsecured, to the executor, or to the trustee appointed under the last will and testament of the decedent. The trustee was also empowered to receive any other property which might be devised, bequeathed, granted, conveyed, or assigned to it by the decedent or by any other person, including insurance policies, and hold the same subject to the terms of the trust. Article IX of the agreement provided: The Donor shall have the right at any time to exercise the options and privileges reserved to him in the policies of insurance deposited hereunder or any assignments thereof, including the right to change the beneficiary, to borrow money thereon, and to receive all payments, dividends, surrender values, *314 benefits or privileges of any kind, which may accrue thereon during his lifetime, without the consent, approval or joinder of the Trustee or of any beneficiary hereunder. It is hereby intended that the trust shall be operative only in respect to the proceeds of the policies which may be due and payable to the Trustee upon the death of the Donor, and/or any money, securities or other property which may have been deposited hereunder subject to the terms of this agreement. In Article X the decedent expressly reserved the right at any time to amend or revoke in whole or in part the trust agreement. By a supplemental agreement executed on November 14, 1930, the decedent revoked Article X in its entirety and substituted in its place the following Article X: The Donor, having had explained to him the difference between a revocable and an irrevocable trust hereby declares this instrument and the trust created hereunder to be irrevocable. Decedent's declared intention in executing the supplemental agreement depriving him of the power to revoke the trusts was to have the trust agreements completely irrevocable and the policies completely assigned to the trusts. Six of the ten insurance *315 policies comprising the corpora of the trusts were taken out by decedent during the years 1896 and 1918. Two of the policies were taken out in 1927, and the remaining two after the formation of the trusts, one in 1930 and the other in 1932. Four of the policies were 10 or 20 year premium payment policies, all of which were paid for or matured prior to the establishment of the trusts. The rest of the policies were ordinary life insurance policies with the premiums payable during the life of the decedent. The value for estate tax purposes of the proceeds of the nine policies in the trust for decedent's wife, is $78,606.59. The value of the one policy in the trust for the daughter, is $12,355.26, or a total of $90,961.85 for the ten policies. Roberta Rhodes Quaile was named the beneficiary in the policy comprising the corpus of her trust and Ellen B. Rhodes was originally named the beneficiary in eight of the nine policies of her trust. The trustee was named the beneficiary of the remaining policy. During the year 1930 petitioner executed riders to each policy which, inter alia, either changed the beneficiary to be the Fidelity Trust Co., trustee, or designated it as the assignee, *316 as trustee under the respective trust agreements. [1] All of the policies and all of the riders are incorporated herein by this reference. In most instances when decedent originally took out the policies, he reserved the rights to change the beneficiary, to borrow money, to take the cash surrender value, to use it to secure extended or paid-up insurance, to participate in surplus and dividends, and to designate the methods of payment upon maturity. The policies usually provided that if the beneficiary were not living at the time of decedent's death the proceeds would be payable to decedent's legal representatives or to his estate. No other property was added to the corpus of each trust. After the death of the decedent, the proceeds of all the insurance policies were paid to the trustee. During the life of the decedent, no income of the trusts was to be paid to any of the beneficiaries. The trustee was not empowered under the trust instruments to exercise during the life of the decedent, any of the rights of ownership under the policies. The *317 Fidelity Trust Co., the trustee, was incorporated under the laws of Pennsylvania and has a perpetual term of existence. The decedent was 59 years old at the time of the execution of the trusts. He was in sound health and physical condition at the time and the transfers to the trusts were not made with the fear of immediate death in mind. The last will and testament of the decedent, which was duly probated, was executed on June 22, 1932. After providing for a series of charitable bequests and for bequests of $5,000 each in trust to his three named grandchildren, the decedent bequeathed the sum of $300,000 in trust for his wife and children, the income to be paid to his wife for life and at her death to his children, with the sons having the power to dispose of their share of the corpus by will, and the daughter having the power to dispose of her share among her surviving children by will. All the residue of the decedent's property was left in trust to his wife for life and then to his children, with the sons entitled to the corpus of the trust when they attained the age of 45, and with the power in the sons to dispose of the corpus by will. The share for the daughter was to be held *318 in trust during her lifetime with the power to appoint among her surviving children. The decedent's two sons and the Fidelity Trust Co., were appointed trustees of the trusts created by the will, and the wife was appointed executrix, with the two sons and the Fidelity Trust Co. as successor executors. The gross estate of the decedent for estate tax purposes as adjusted by the respondent is $886,348.96. Respondent determined that the proceeds of the ten policies transferred to the two trusts in 1930 were includible in the gross estate under sections 811 (c) or 811 (g). The transfers to the two trusts of the ten insurance policies in 1930 were made in contemplation of death. Opinion Respondent determined that the proceeds of the ten insurance policies transferred to the trusts in 1930 were includible in decedent's gross estate either as transfers made in contemplation of or intended to take effect in possession or enjoyment at or after decedent's death under section 811 (c) of the Internal Revenue Code, or as the proceeds of life insurance with respect to which decedent retained at his death legal incidents of ownership under section 811 (g). The contention *319 that the transfers were intended to take effect in possession or enjoyment at or after death is bottomed upon an alleged possibility of reverter, i.e., that under the terms of each policy, though not under the terms of the trust instruments, there was a possibility that the proceeds might have become payable to the decedent's estate if the named beneficiary, that is, the wife or daughter, predeceased him. The assertion that the proceeds were also includible in the gross estate as proceeds of life insurance is claimed to be supported by the legal incidents of ownership which decedent allegedly retained at his death, including the alleged possibility of reverter, the right to borrow money, to take the cash surrender value, to use it to secure extended or paid-up insurance, to participate in surplus and dividends, and to designate the methods of payment upon maturity. The contemplations of death argument is based on the contention that insurance is by its very nature connected with death, and that the transfers in trust were a substitute for testamentary disposition. In addition, respondent advances on brief, but does not discuss, the claim that the trusts were also includible in the *320 gross estate under section 811 (d) (2) since under Article IX of the trust instruments, which respondent argues was operative and not revoked at the time of the decedent's death, the decedent retained the power to alter or amend the enjoyment of each trust. Petitioners deny, and we do not understand respondent to assert otherwise, that the transfers were made at a time when the decedent had an apprehension that death was imminent or near, or that he was induced to set up the trusts by the serious state of his health or because of advanced age. Petitioners further assert that the decedent had no more contemplation of death in making the transfers than any one does in taking out policies of life insurance, which by their very nature are tied to the death of the insured. Petitioners further deny that the decedent in light of his expressed and allegedly successful attempt to make the trusts irrevocable, retained any power to alter or amend the terms of the trusts or the rights of the parties thereunder, or that he retained at his death a possibility of reverter which would either be an incident of ownership under section 811 (g), or the string to draw the transfers into the gross estate *321 under section 811 (c) as intended to take effect in enjoyment or possession at or after death. Finally, petitioners argue that after the execution of the supplemental agreement depriving the decedent of the power to revoke the trusts, he retained no incidents of ownership in the policies of insurance which could cause the proceeds to be included in the gross estate under section 811 (g). Since we believe that the transfers of the ten policies to the trusts in 1930 were made in contemplation of death within the meaning of section 811 (c), we find it unnecessary to discuss the other contentions advanced by the parties. As in the Estate of Arthur D. Cronin, 7 T.C. 1403 (promulgated December 30, 1946), indications that the decedent was dominantly impelled by advancing age or insecure health to make the transfers in question are absent. But the circumstances of these transfers in other respects persuade us, as they did in the Cronin case, that the transfers were substitutes for testamentary dispositions and were actuated primarily by motives of the sort which lead to testamentary dispositions. United States v. Wells, 283 U.S. 102. It is significant that *322 the subject matter of the transfers, the insurance policies, were inherently testamentary in nature. See Estate of Cronin, supra.This alone does not result in a holding, as petitioners contend should not be the result, that the taking out of insurance on one's life is necessarily always done in contemplation of death within the meaning of section 811 (c). In the ordinary case, the insured may and often does retain valuable incidents of ownership exercisable during his lifetime. The purchase of insurance may thus, in many instances, be prompted for the most part by motives associated with life, which under the rationale of Colorado National Bank v. Commissioner, 305 U.S. 23, would support a conclusion under certain facts that the purchase of the insurance is not made in contemplation of death within the statutory meaning. But this is not true in this case. Decedent transferred the policies to two trusts, one for his wife and the other for his daughter, under such circumstances that, accepting arguendo the petitioner's claim that the decedent retained none of the incidents of ownership, no rights to the enjoyment of any of the benefits of the insurance would *323 arise until after his death. The trusts were subject to spendthrift provisions so that the beneficiaries could in no way anticipate their enjoyment of the proceeds. The trustee was not empowered under the trust instruments to exercise during the life of the decedent any of the rights of ownership under the policies. It was expressly provided in the instruments that it was the intention of the decedent that the trusts should be operative only in respect to the proceeds of the policies which would become due and payable to the trustee upon the death of the decedent. Although the trust would attach to other property which might be deposited thereunder, any income arising from other property was to be applied to the payment of premiums on the life insurance policies or to such other purposes as the decedent might direct, and no income during the decedent's lifetime was to be paid to any of the beneficiaries. Consequently, the intended operation of the transfers closely approximated that of a testamentary disposition. See Estate of Cronin, supra; Estate of Paul Garrett, Deceased, Evelyn E. Garrett, et al., Executors, 8 T.C. 492. Moreover, the trust agreements *324 reveal an intimate connection in the decedent's mind between the estate which would arise upon his death and the establishment of the trusts. The instruments specifically provided that the trustee might at its discretion, purchase any property, real or personal, of which the decedent died seized or possessed, and might make loans to the executor or to the trustee appointed under the last will and testament of the decedent. The trusts favored the same beneficiaries who are the beneficiaries under the decedent's will, and the trusts made substantially the same distributive provisions as are made by the decedent's will. The trustee of the life insurance trusts was named as one of the trustees under the will, and also as a successor executor. Viewed in their entirety, it is not difficult to consider the will and the life insurance trust instruments as integrated parts of a single plan, testamentary in nature, for the disposition of decedent's estate to take effect at his death. See Estate of A. R. Davidson v. Commissioner, 158 Fed. (2d) 239 (November 11, 1946). For the reasons above stated, it is held that the transfers of the ten insurance policies to the trusts were made *325 by decedent in contemplation of death within the meaning of section 811 (c) and were, therefore, properly included in the gross estate of the decedent. See Thomas v. Graham, 158 Fed. (2d) 561 (December 12, 1946); and Vanderlip v. Commissioner, 155 Fed. (2d) 152; certiorari denied, 329 U.S. 728 (October 14, 1946). Decision will be entered under Rule 50. Footnotes
1. It is unnecessary to set forth all of the details of the various riders, some of which differed from others in certain respects.↩